**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
**UNITED STATES OF AMERICA,**

    -against-                                                   **ORDER**
                                                                  07-CR-331 (NG) (RLM)

**ARKADIY S. BANGIYEV,**

                          **Defendant.**
-------------------------------------------------------------------X
**GERSHON, United States District Judge:**

      On March 20, 2007, United States Secret Service agents arrested defendant for selling $100,000 of counterfeit United States currency to Devon Bost, who was cooperating with the government. A grand jury subsequently indicted defendant on one count of conspiracy to deal in counterfeit currency and one count of dealing in counterfeit currency. On May 19, 2008, following trial by jury, defendant was convicted of one count of dealing in counterfeit currency under 18 U.S.C. § 473 and acquitted of conspiracy to deal in counterfeit currency under 18 U.S.C. § 371. Defendant now moves for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure and for a new trial, under Rule 33, on the grounds of juror dishonesty during voir dire and juror misconduct during deliberations or, in the alternative, for a hearing on juror misconduct.

**I.**    **Voir Dire**

      On May 5, 2008, the court commenced jury selection by instructing the venire that "the purpose of our jury selection procedure is to be sure that we have a fair and impartial jury which will not be affected by biases one way or the other in viewing the evidence that's going to be presented." Voir Dire Transcript ("V.D.T.") 13. The court stated that its goal was "to determine whether or not there's anything about the nature of this particular case that would affect your ability to be fair to all the parties in the case." V.D.T. 27.

1

Among the specific questions posed to prospective jurors were the following:

> "Has anyone ever been employed by a law enforcement agency? That would include the Police Department, any of the local Police Departments, Secret Service, the FBI, Alcohol, Tobacco and Firearms, any law enforcement agency?" V.D.T. 70.

> \* \* \* \*

> Has anyone ever applied for work, even if you didn't take the job, for a law enforcement agency or District Attorney's Office or U.S. Attorney's Office? V.D.T. 79

> \* \* \* \*

> "Is there anyone in the jury who is a member of any police organization like, you know, auxiliary police or any local crime protection group or anything of that nature? V.D.T. 79

> \* \* \* \*

> "Has anyone been active in any organizations that take[] public positions on criminal law issues?" V.D.T. 79-80.

> \* \* \* \*

> "I'd like to now hear about any connections you have with the legal profession; whether you personally again, or anyone close to you. Lawyers, judges, paralegals, legal secretary, anything like that, okay?" V.D.T. 80.

The jurors were reminded that voir dire is intended to reveal any potential biases that may prevent a juror from being impartial. The court stated further, "if there's any question that I didn't ask that might cause you to think that you could be, you would be unfair in this case, I need you to tell me. You're the only people who can tell." V.D.T. 111.

After regular jurors were chosen, the court commenced selection of alternates by instructing the venire that "the alternates are just as important as the regular jurors and it's just as important that they be fair and impartial." V.D.T. 148. Eight potential alternates were selected and asked whether

2

any had answers to questions previously asked of the other jurors. One potential alternate, Thomas Rozinski, raised his hand. The following conversation ensued at sidebar:

> Rozinski: "I'm a member of the New York State Bar. I've been an attorney for 20 years. I have not actively practiced in a firm or been employed as a lawyer for the last six years. I'm a college professor and I teach Political Science."
> Court: "Good. Any reason you can't serve?"
> Rozinski: "No, absolutely not, I just thought you should be aware of that."
> Court: "Good, anything else you need to tell me about?"
> Rozinski: "No."

V.D.T. 151. Neither defense counsel nor the government requested the court to inquire further of Rozinski's background or experience. Later, in response to the court's questions regarding jurors' personal lives, Rozinski stated the following:

> "I am single, I live in Jackson Heights. I have a bachelors degree in economics and political science. I have a masters degree in government and I have a law degree. I am a professor of political science. I get my news from the Internet and from satellite radio. And I'm a member of the American Contract Bridge League. And I think that's it."

V.D.T. 168. Rozinski was selected as an alternate juror. Prior to commencement of trial, after juror number nine was excused, Rozinski was seated as juror number nine.

## II. Evidence At Trial

The government's case consisted of testimony from various Secret Service Agents, including Case Agent Arturo DeSimone and Special Agent Donald McGrail, both of whom worked with Bost; Special Agent Jason D'Orio, who, along with Special Agent Erica Arkin, monitored the sale of counterfeit currency that resulted in defendant's arrest; Special Agent John Wilson, who arrested Yakob Yusupov, an associate of defendant, in possession of counterfeit currency forensically linked

3

to that sold by defendant; and Special Agent Kelly Harris, a counterfeit specialist who testified that the recovered currency was counterfeit. The government played for the jury recorded conversations between Bost, who did not testify at trial, and defendant which were admitted into evidence with limiting instructions.[1]

The government's case-in-chief began with Agent DeSimone's testimony that, on March 6, 2007, agents arrested Alvin Wren for possessing counterfeit United States currency. Wren revealed the source of the counterfeit currency as Devon Bost and, cooperating with agents, purchased $20,000 in counterfeit currency from Bost on March 19, 2007. Bost was arrested that day, after which a search of his vehicle revealed no contraband or relevant materials. That same day, Bost decided to cooperate with agents and placed a telephone call to defendant at approximately 10:40 p.m. which agents recorded. When Bost told defendant that Bost's "peoples is here with the . . . ten karat situation," defendant replied he could meet Bost at 11:30 p.m. at the intersection of Main Street and 78th Road in Queens, New York.

Although Bost did not testify at trial, Agent DeSimone, who "handled" Bost during his cooperation with the government, testified that, in preparation for Bost's meeting with defendant, he placed on Bost two electronic devices: a recording device and a monitoring device which, although not capable of recording audio, allowed surveilling agents to listen to his conversations in real time. Agents gave Bost $4,600 in genuine United States currency for the transaction. Agent McGrail testified that, prior to the meeting, he searched Bost's vehicle for a second time and found

---

[1] As a condition of his release on bond the day after his arrest, Bost's travel was restricted to the Eastern and Southern Districts of New York. On November 29, 2007, Bost was arrested in North Carolina and released. The government represented to the court, outside the presence of the jury, that it was unable to locate him.

no counterfeit currency or other contraband. Bost then drove his vehicle from JFK airport to the intersection of Main Street and 78th Road where he was to meet defendant. Agents followed. Prior to arriving, Bost pulled his vehicle to the side of the road. Agent DeSimone approached and found Bost making a cigarette with, as Bost described it, "weed." Agent DeSimone took the cigarette from Bost and discarded it.[2]

Meanwhile, Agents D'Orio and Arkin parked their vehicles across the street from the meeting place near the corner of 78th Road. Bost arrived at approximately 11:45 p.m. Just before midnight, defendant arrived in a white Lexus sport utility vehicle and parked alongside Bost's vehicle. Bost exited his vehicle, opened the passenger door of defendant's vehicle, and got inside. Once inside, after Bost said to defendant, "let me get your money brotha," defendant replied, "[i]n the back, in the back . . . [o]ver there, behind your seat. . . . Over there is a bag. Take it." At the end of this conversation, defendant stated, "10 karat alright?". Bost exited defendant's vehicle and defendant drove away. A recording of the conversation was played to the jury.

Agent D'Orio testified that, after the meeting, Bost returned to his vehicle carrying a bag he had not possessed prior to meeting defendant. Agents stopped defendant's vehicle and arrested him. An agent searched defendant's vehicle and recovered the $4600 agents had given Bost earlier.

Meanwhile, Agent DeSimone attempted to locate Bost, who had driven away from the meeting place. DeSimone called Bost and they discussed his location. Bost was out of DeSimone's sight for approximately seven minutes, although the two men maintained contact via the transmitter

---

[2] In addition to the "weed," agents later discovered that Bost was in possession of a cellular telephone in addition to the one used by agents to communicate with him during the operation. Agent McGrail's searches of Bost's vehicle, conducted before Bost's meeting with defendant, did not reveal either the "weed" or the second cellular telephone.

5

and by telephone. When DeSimone relocated Bost, Bost handed him a yellow plastic bag containing $100,000 in counterfeit $50 bills. Kelly Harris, a counterfeit specialist for the Secret Service, testified that the recovered currency was, in fact, counterfeit.

The government also presented telephone records via stipulation which established that, between February 1, 2007 and March 20, 2007, defendant engaged in 43 telephone conversations with Yakob Yusupov, who had previously been arrested for possession of counterfeit currency. Less than 24 hours before defendant's arrest, a telephone conversation occurred between him and Yusupov, followed 20 minutes later by a call between defendant and Bost. Counterfeit specialist Harris testified that the bills recovered from Yusupov, although in denominations different from those recovered from Bost after his meeting with defendant, were created from a common source. In addition, Special Agent John Wilson testified that, on March 8, 2007, he observed defendant drive a white Lexus sport utility vehicle to a video store in Queens owned by Yusupov. A few minutes after arriving, Yusupov exited his store, entered the passenger side of defendant's vehicle, and the two men drove away.

The defense case consisted of testimony from Trevon Wray, a friend of Bost who testified that he had seen him in Long Island in February 2008, his appearance altered, and that defendant maintains a jewelry store at which Wray had purchased jewelry. The defense also presented three character witnesses, Rabbi Itzhak Yehosua, Roshel Pinkasov, and Emanuel Ilyabyev, all of whom attested to defendant's good character and reputation.

### III. The Court's Post-Verdict Contact With Two Jurors

On May 21, 2008, I issued the following memorandum to counsel:

> On Monday, May 19, 2008, at approximately 5 p.m., on the corner of Cadman Plaza West and Clark Street, I passed two jurors, who I

> believe were jurors numbers 5 and 11. As I passed, the juror I believe
> to be juror number 11, asked me if she could talk to me. I responded
> that I could not talk to her about the case, and she asked if that were
> so even if she had a question about her decision. I responded that I
> could not discuss that with her and walked away.

## DISCUSSION

I.  **Rule 29 Motion**

   A.  **Standard**

Rule 29(a) provides that "the court on the defendant's motion must enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(c). In cases where "the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." *Id*. "A defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient." *United States v. Cruz*, 363 F.3d 187, 197 (2d Cir. 2004). If "'after viewing the evidence in the light most favorable to the [government], *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" a defendant's conviction should not be overturned. *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004), *quoting Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in *Jackson*). "While we defer to a jury's assessments with respect to credibility, conflicting testimony, and the jury's choice of the competing inferences that can be drawn from the evidence, specious inferences are not indulged." *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004) (quotation marks and citations omitted). "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (quotation marks omitted). Nevertheless, "[o]ur evaluation looks at the evidence in its

7

totality, and the Government need not negate every theory of innocence." *Glenn*, 312 F.3d at 63 (quotation omitted). Thus, the Court must review evidence offered at trial "as a whole, not in isolation." *United States v. Canady*, 126 F.3d 352, 356 (2d Cir. 1997) (quotation omitted). "[T]he government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt." *Rodriguez*, 392 F.3d at 544. Indeed, "the jury's verdict may rest entirely on circumstantial evidence." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003).

## B. Defendant's Contentions

Defendant argues that the court should enter a judgment of acquittal because the government failed to establish the elements of dealing in counterfeit currency. He bases his motion on several specific grounds, each discussed below, none of which has merit.

Defendant asserts that the absence of Bost as a witness rendered the evidence insufficient. However, the government presented evidence sufficient to support the verdict, including the testimony of Agents DiSimone and McGrail, who worked with Bost; Agent D'Orio, who, along with Agent Arkin, monitored the sale of counterfeit currency that resulted in defendant's arrest; Agent Wilson, who arrested Yusupov in possession of counterfeit currency forensically linked to that sold by defendant; and a counterfeit specialist who testified that the recovered currency was counterfeit. In addition, phone records, along with Agent Wilson's testimony, established a link between defendant and Yusupov. As discussed below with regard to the specific evidentiary insufficiencies alleged by defendant, these witnesses and documentation provided evidence sufficient to support the jury's verdict. While defendant produced evidence that Bost was present in New York in February 2008 and argued to the jury that Bost fled because he knew his lies to the government

8

would be revealed at trial and that the government would therefore not give him the benefits of his cooperation agreement, neither the evidence nor the argument precluded the jury from crediting, as it obviously did, testimony provided by the government's witnesses. In sum, Bost's absence, in and of itself, did not render the government's case insufficient as a matter of law.

Contrary to another of defendant's assertions, the government produced evidence from which a reasonable jury could find that defendant possessed counterfeit currency at the monitored meeting with Bost and that he sold it to Bost. As noted above, Agent McGrail testified that his search of Bost's vehicle, conducted immediately prior to Bost's meeting with defendant, revealed that Bost was not in possession of counterfeit currency. Agent D'Orio testified he saw defendant arrive at the meeting place. Agents then heard, and the recording device recorded, defendant instruct Bost to take a bag from the back of defendant's vehicle. Audible on the recording is, as argued by the government, the sound of a bag being handled. Agent D'Orio then observed Bost exit defendant's vehicle holding a bag and defendant drive away. Bost then entered his vehicle and drove away. Agent DiSimone testified that he subsequently recovered from Bost a bag containing $100,000 in counterfeit currency which was later determined to be linked to the bills recovered from Yusupov, an associate of defendant.

Defendant argues that, because Agent McGrail's search of Bost's vehicle and person prior to Bost's meeting with defendant did not reveal the substance Bost later identified as "weed" or the presence of a second cell phone, the government "failed to establish that Bost and his [car] were adequately searched so as to establish beyond a reasonable doubt that Bost had not possessed the counterfeit bills before he met with Mr. Bangiyev." Defendant presented this argument to the jury, which rejected it. Rather, the jury credited the testimony of Agents DeSimone and McGrail that

9

Bost was not in possession of counterfeit currency prior to meeting with defendant. In addition, defendant argues that, because Bost was not within view of Agent DeSimone for approximately seven minutes after his meeting with defendant, "there was no assurance that the items that the Government alleges to have been given by Mr. Bangiyev to Bost were the same items that were recovered by the agents from Bost seven minutes later." Affirmation of Richard Finkel, Esq. ("Finkel Aff.") ¶ 56. This argument was also presented to the jury, which rejected it. "Matters of the choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury, and [courts] are not entitled to second-guess the jury's assessments." *United States v. Rea*, 958 F.2d 1206, 1221-1222 (2d Cir. 1992). Moreover, the inferences drawn by the jury in concluding that defendant was guilty were entirely reasonable. Although "a reasonable jury must necessarily entertain a reasonable doubt" where the evidence equally supports competing inferences, *Glenn*, 312 F.3d at 70, the inferences here were not equally supported.

Defendant next argues that no evidence supported the government's argument on summation that "carat" was code for counterfeit currency. In fact, defense counsel argued this point on summation, reminding the jury that "the only testimony you've heard about carats is carats in jewelry; and you know that from Trevon Wray that Bost was a jewelry customer of [defendant's]." Trial Transcript 1063. However, in light of the audio recording which revealed that defendant instructed Bost to take a bag from the back of defendant's car, seven minutes after which Bost was located with a bag containing counterfeit currency, a jury could reasonably conclude that the term "carat" referred to counterfeit currency. Significantly, the jury heard evidence that no jewelry was recovered from Bost after his meeting with defendant. "The government's case need not exclude

every possible hypothesis of innocence . . . and it is the task of the jury, not the court, to choose among competing inferences." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) (quotations and citations omitted). Here, to the extent the evidence supported an alternate inference, the jury did not draw it. In any event, that "carat" was code for "counterfeit currency" was not essential to the government's case which, as discussed above, included additional direct and circumstantial evidence sufficient to support the verdict. Finally, defendant raised no objection to the government's argument in summation that "carat" was code for "counterfeit currency."

Several of defendant's remaining contentions fail for similar reasons, including his assertion that the defense presented legitimate reasons and explanations for the meeting on March 19, 2007 between Bost and defendant, and for why Bost owed defendant $4,600. Further, defendant argues that uncontradicted evidence of his good character and reputation established that the government's evidence was insufficient. The defense presented these arguments to the jury; all were rejected.

Finally, defendant's contention that the agents failed to utilize the speakerphone option on Bost's cell phone which, he argues, would have enabled the recording device to record both sides of his conversations is, in essence, a challenge to the investigatory method employed by the agents, rather than an assertion regarding the sufficiency of the evidence. Whether this technique would have resulted in any exculpatory evidence is speculative and, in light of the "well-established deference to the Government's choice of investigatory methods" that this court must afford, *see United States v. Rahman*, 189 F.3d 88, 131 (2d Cir. 1999), I find this contention meritless.

In sum, notwithstanding the lack of testimony from Bost, the government presented evidence from which a reasonable jury could find the elements of dealing in counterfeit currency. Resolving conflicts or inconsistencies in the evidence is the province of the jury which, in this case, resolved

them in favor of the government. Accordingly, defendant's motion to set aside the verdict is denied.

## II. Rule 33 Motion

Defendant moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure on the grounds that the jury was not impartial and that it was improperly influenced by extraneous information. In particular, defendant asserts that information obtained after trial, via internet research, indicates that juror Rozinski "intentionally failed to bring to the Court's attention numerous salient factors sought and required by the court and that directly impacted upon his qualifications as a juror." Reply 8. According to defendant, Rozinski was "no ordinary prospective juror"; he received a bachelor's degree from Yale University, a master's degree from Harvard University, a law degree from Harvard, and taught at the University of Michigan law School; he was a litigator at two New York City law firms, and served for seven years as general counsel to two New York City agencies and as acting commissioner of homeless services. Had Rozinski revealed this information during voir dire, defense counsel, he asserts, would have challenged him for cause. If the court had rejected his cause challenge, defense counsel asserts, he would have exercised a peremptory strike to prevent Rozinski from becoming an alternate juror. Pointing to the court's post-verdict contact with two jurors, counsel further asserts he "believes that jurors were coerced, and unduly and improperly influenced by juror Rozinski because of his positions as a law professor and litigator." Def. Br. 8. If the court does not grant defendant's motion to vacate, he alternatively seeks a hearing on the latter claim.

### A. Standard

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). In other words, a court may "set aside

12

a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (quotation omitted). A trial court must exercise its Rule 33 authority "sparingly and in only the most extraordinary circumstances." *Id*. at 134 (quotations omitted). "There must be a real concern that an innocent person may have been convicted." *Id*.

### B. False Voir Dire Responses

As the Supreme Court has noted, "one touchstone of a fair trial is an impartial trier of fact - a jury capable and willing to decide the case solely on the evidence before it." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (quotation omitted). Under *McDonough*, "a party alleging unfairness based on undisclosed juror bias must demonstrate first that the juror's voir dire response was false and second that the correct response would have provided a valid basis for a challenge for cause." *United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006), citing *McDonough*, 464 U.S. at 556. *McDonough*'s two-part test applies to inadvertent as well as deliberate nondisclosures or misstatements. *See United States v. Langford*, 990 F.2d 65, 68 (2d Cir. 1993). While "[t]he motives for concealing information may vary, . . . only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *McDonough*, 464 U.S. at 556. A good faith failure to respond correctly to a question does not, without more, warrant a new trial. *See United States v. Shaoul*, 41 F.3d 811, 815-16 (2d Cir. 1994); *see also Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) ("an honest yet mistaken answer to a voir dire question rarely amounts to a constitutional violation; even an intentionally dishonest answer is not fatal, so long as the falsehood does not bespeak a lack of impartiality"), citing *McDonough*, 464 U.S. at 555-56. Finally, a strong presumption exists against setting aside jury verdicts based on charges of juror misconduct. *Tanner v. United States*, 483 U.S. 107, 120 (1987). In fact, the Second Circuit "has never found

reason to overturn a verdict on the basis of juror nondisclosure under *McDonough* and only once, *see United States v. Colombo*, 869 F.2d 149 (2d Cir. 1989), has remanded for an evidentiary hearing on the matter." *Stewart*, 433 F.3d at 303.

Defendant relies heavily on *Colombo*, in which a juror, Geller, responded "no" to a voir dire question whether any of her relatives were lawyers or had ever been involved in law enforcement. *See Colombo*, 869 F.2d at 150. After the guilty verdict, the defense produced an affidavit by another juror, Kennedy, stating that Geller had a brother-in-law who was a government attorney and that Geller purposely withheld this information for fear of being removed from the jury. *Id*. Kennedy also alleged that Geller revealed she lived near a restaurant at which defendants met and that Geller "'knew it was a hang out for gangsters.'" *Id*. Following the district court's denial of the motion for a new trial, the Second Circuit remanded for a hearing on the validity of Kennedy's allegations, noting that, if true, Geller's statements "indicated an impermissible partiality." *Id*. at 151.

Defendant argues that *Colombo* requires a new trial whenever it is discovered that a juror responded falsely to a question during voir dire. However, the Second Circuit has rejected this position, making clear that *Colombo* is limited to its facts. *See United States v. Langford*, 990 F.2d 65, 69 (2d Cir. 1993). The *Langford* Court summarized *Colombo* as follows:

> we did not suggest a *per se* rule based simply on whether a prospective juror had lied, without respect to whether the dishonesty had a bearing on her impartiality. Rather, we held that a juror who claims to know that a locale at which the evidence will place the defendant is a "'hang out for gangsters,'" and who has deliberately responded falsely to a material question on voir dire precisely because she wanted to sit on the case, should be presumed not to be impartial.

*Id*. *Langford* makes clear that a presumption of impartiality is warranted under *Colombo*, and a hearing therefore necessary, where a defendant can produce evidence that a juror had "evidentiary

14

knowledge relating to [the defendant's] case" *in addition to* evidence that false answers were given because she wanted to sit on the case. *Id*. at 69-70. Thus, in *Langford*, notwithstanding the juror's intentional nondisclosure of her criminal history, the Second Circuit affirmed the district court's denial of the defendant's motion for a new trial because "there was no suggestion . . . that [the juror] had any evidentiary knowledge relating to Langford's case," and the district court's finding that there was "'absolutely no evidence' that [the juror] was in any way biased or prejudiced against Langford" was not clearly erroneous. *Id*.

*Colombo* is of no help to defendant here. Based on the record, Rozinski simply was not dishonest, and defendant therefore fails the first prong of the *McDonough* test. Defendant asserts incorrectly that jurors were asked to disclose "positions held with government." Finkel Aff. ¶ 111. However, as noted above, *see above*, p. 2, the court made no such request, inquiring only with respect to employment with any "law enforcement agency," as examples of which the court mentioned the "Police Department, any of the local Police Departments, Secret Service, the FBI, Alcohol, Tobacco and Firearms," V.D.T. 70, 79, as well as inquiring as to whether any jurors had sought employment with any "District Attorney's Office or U.S. Attorney's Office." V.D.T. 79. Thus, Rozinski was not dishonest by not revealing his past employment with the New York City Law Department.[3] Even if Rozinski had deliberately misled the court, that he did so in order to sit on the jury – a wholly speculative assertion – would be an insufficient motivation under *McDonough*

---

[3] Defendant's efforts to show that the New York City Law Department is a law enforcement agency and that Rozinski was an agent of law enforcement when he worked there are unpersuasive, especially in light of the examples of law enforcement entities given to the jury. Even if the Law Department performs what could be understood as some limited law enforcement functions, Rozinski cannot be viewed as having lied when he did not identify it as a law enforcement agency.

15

because "only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *McDonough*, 464 U.S. at 556; *see also Langford*, 990 F.2d at 69. As in *Langford*, defendant has failed to produce any evidence that Rozinski was in any way biased or prejudiced against him. *See Langford*, 990 F.2d at 70.

Even if defendant could satisfy *McDonough*'s first prong by demonstrating that the New York City Law Department is a law enforcement agency, he would fail the second prong because Rozinski would not have been removable for cause. "It is well settled that a juror not shown to have actual bias is not excludable merely because he or she is a member of a particular occupation or even of law enforcement." *United States v. Marji*, 158 F.3d 60, 62 (2d Cir. 1998); *see also United States v. Morales*, 185 F.3d 74, 84 (2d Cir. 1999) (status as law-enforcement officer does not render a juror presumptively biased supporting challenge for cause; actual bias needed). As mentioned, no evidence, either in the record or produced by defendant in connection with this motion, indicates that Rozinski harbored any bias against him. Indeed, the court on several occasions impressed upon all jurors, including Rozinski, the importance of an impartial jury. Rozinski specifically stated that nothing in his background would prevent him from serving as a juror in this case. Finally, any suggestion that defendant was denied his right to exercise a peremptory challenge as to Mr. Rozinski is meritless. Defense counsel did not seek further inquiry into Rozinski's work experience and background notwithstanding the court's repeated inquiries as to whether counsel had further questions for any jurors. Under these circumstances, there is no basis for ordering a new trial.

### C. The Court's Post-Verdict Contact With Two Jurors

Defendant next argues that the court must conduct a post-verdict hearing in order to determine whether, as "Counsel believes[,] . . . jurors were coerced, and unduly and improperly

influenced by juror Rozinski because of his positions as a law professor and litigator." Def. Br. 8. As evidence of this alleged coercion, defendant cites the court's post-verdict contact with two jurors and speculates that the impetus for their approach was "to advise the Court that juror Rozinski had lectured the jury about his experiences with defense attorneys and about his knowledge and interpretation of the rules of law." Def. Br. 9.

"Post-trial jury scrutiny is disfavored because of its potential to undermine 'full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople.'" *Stewart*, 433 F.3d at 302, quoting *Tanner*, 483 U.S. at 120-21. Accordingly,

> probing jurors for "potential instances of bias, misconduct or extraneous influences' after they have reached a verdict is justified 'only when reasonable grounds for investigation exist," in other words, where there is "clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial."

*Id*. at 302-03, quoting *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983).

Having produced no evidence in support of his allegation of juror coercion, defendant's argument amounts to mere speculation. As such, he cannot meet his burden. Moreover, as Judge Friendly long ago noted, quoting *United States v. McKinney*, 429 F.2d 1019, 1023 (5th Cir. 1970):

> "while the jury may leaven its deliberations with its wisdom and experience, in doing so it must not bring extra facts into the jury room. In every criminal case we must endeavor to see that jurors do not [consider] in the confines of the jury room . . . *specific facts about the specific defendant then on trial*."

*United States ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir. 1970) (emphasis added). Judge Friendly distinguished between "*any* matters not of record" and "specific extra-record *facts* relating to the defendant." *Id.* (emphasis in original). The former, such as personal experiences, are

17

permissible influences on jury deliberations. *See Marquez v. City of Albuquerque*, 399 F.3d 1216, 1223 (10th Cir. 2005) ("A juror's personal experience . . . does not constitute 'extraneous prejudicial information.'"), quoting 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 606.03(1)(b) (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2004). The latter, of course, require a new trial if prejudicial. *See Owen*, 435 F.2d at 818 (prejudice found, and due process violated, where during deliberations jurors mentioned they knew "all about Owen," that his father constantly got him "out of trouble," that he had been suspended from the police force in connection with misconduct, and that he was involved in a fight).

Here, defendant does not allege that Rozinski introduced into deliberations any additional facts about defendant. Cases relied on by defendant are inapposite. *See, e.g., United States v. Swinton*, 75 F.3d 374, 381 (8th Cir. 1996) (remanding for hearing where post-verdict evidence indicated jury considered defendant's prior conviction, which was "extraneous prejudicial information" within the meaning of Fed. R. Evid. 606(b)); *United States v. Ianniello*, 866 F.2d 540, 544 (2d Cir. 1989) (remanding for hearing to determine whether judge's ex parte statement to jury during deliberations that she "did not want a hung jury" was prejudicial); *United States v. Perkins*, 748 F.2d 1519, 1534 (11th Cir. 1984) (remanding for new trial in light of evidence that, during deadlocked jury deliberations, a juror voting for conviction revealed he knew defendant).

Defendant's request for a hearing is denied.

## CONCLUSION

For the reasons stated above, defendant's motions for judgment of acquittal under Fed. R. Crim. P. 29 and a new trial under Fed. R. Crim. P. 33 are denied, as is his request for a hearing on his allegations of juror misconduct.

**SO ORDERED.**

*/S/ Nina Gershon*
**NINA GERSHON**
**United States District Judge**

Dated: September 12, 2008
      Brooklyn, New York